IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

DR. SAMUEL D. SILVA RAMIREZ,

**Plaintiff,**

v.                                    CIVIL NO. 11-1286 (FAB)

HOSPITAL ESPAÑOL AUXILIO MUTUO,
INC., *et al.*,

**Defendants.**

OPINION & ORDER[1]

BESOSA, District Judge

Plaintiff has filed a motion for remand. (Docket No. 7.) Defendants have opposed the motion. (Docket No. 11.) Having considered the arguments contained in plaintiff's motion and defendants' opposition, the Court **GRANTS** plaintiff's motion for remand. (Docket No. 7.)

I.   **FACTUAL BACKGROUND**

Dr. Samuel D. Silva-Ramirez ("Dr. Silva") is a medical doctor with a specialty in Gynecology and Obstetrics. At times relevant to this Complaint, he enjoyed medical privileges at the Hospital Español Auxilio Mutuo ("Auxilio Mutuo"). Auxilio Mutuo alleges that it is a lay medical hospital institution, not affiliated to

---

[1] Myrgia Palacios, a fourth-year student at Interamerican University Law School, assisted in the preparation of this Opinion and Order.

the Roman Catholic Church.   Auxilio Mutuo's Bylaws do not state that it has any affiliation with the Catholic Church.   The hospital's Bylaws do not require that its medical faculty have either the duty or the obligation to follow the teachings of the Catholic Church while they practice their profession at the hospital.  Auxilio Mutuo has not adopted the "Ethical and Religious Directives for Catholic Health Care Facilities" in its Bylaws. Neither do Auxilio Mutuo's Bylaws limit the carrying out of sterilization procedures by its medical faculty.

Dr. Silva alleges, nevertheless, that Auxilio Mutuo does follow the teachings of the Catholic Church when it comes to sterilization procedures.   Dr. Silva further alleges that he did not agree to follow those teachings to be able to practice his profession at Auxilio Mutuo, and admits that the hospital did not require that he commit to these teachings as a condition of obtaining his medical privileges.  (Docket No. 12-1 ¶¶ 3, 6, 9-10, 12, 15.)

On October 14, 2009, Dr. Silva was in one of Auxilio Mutuo's Operating Rooms performing a Cesarean section[2] on one of his

_____

[2] A Cesarean section is a surgical procedure in which one or more incisions are made through a mother's abdomen (laparotomy) and uterus (hysterotomy) to deliver one or more babies, or, rarely, to remove a dead fetus.  See http://en.wikipedia.org/wiki/Caesarean_section

patients.  Dr. Silva then performed a sterilization procedure on the patient.  His patient was not Catholic and did not follow the postulates of the Catholic Church on the issue of sterilization. Dr. Silva alleges that the personnel assisting him during the sterilization procedure reported to hospital authorities that after the Cesarean section procedure was carried out he sterilized his patient without her consent.  Id. ¶¶ 12, 14.

    As a result of Dr. Silva's performing a sterilization that was allegedly done without obtaining the patient's proper consent, Auxilio Mutuo temporarily suspended Dr. Silva's medical privileges. Because of the temporary suspension, Dr. Silva was barred from performing any kind of gynecological, obstetric or surgical procedure, whether elective or emergency, at the hospital. Dr. Silva's temporary suspension also precluded him from assisting his private patients in births that had already been scheduled to be delivered at Auxilio Mutuo.  The hospital notified Dr. Silva of his temporary privilege suspension on November 18, 2009 through a letter signed by Auxilio Mutuo's Medical Director, Dr. Jose A. Isado-Zardon ("Dr. Isado").  At the time of his temporary suspension, Auxilio Mutuo was the only hospital where Dr. Silva enjoyed active medical privileges.  Id. ¶ 15.

Auxilio Mutuo stated reasons for Dr. Silva's temporary suspension were:  (1) that the sterilization consent form was incomplete; (2) that Dr. Silva did not follow the protocol for sterilization; and (3) that Dr. Silva had violated Auxilio Mutuo's Bylaws.  Dr. Silva states, however, that his patient had consented to the procedure, that it was done in accordance with his patient's request, that it was medically indicated and that the consent form shows his patient gave her consent because it bears her signature and initials on every page.

Auxilio Mutuo's protocol for sterilization procedure is not part of its Bylaws.  Id. ¶¶ 9-10, 14, 20, 25.  On November 19, 2009, Dr. Alvaro Aranda ("Dr. Aranda"), President of Auxilio Mutuo's Medical Faculty Executive Committee ("Committee"), informed Dr. Silva of his rights to request an evidentiary hearing prior to the determination of whether the temporary suspension would be maintained pending a final adjudication of his case.  Id. ¶ 18.

On November 24, 2009, Dr. Silva requested a formal hearing as well as the production of relevant documents in preparation for the hearing.  Instead of scheduling a hearing, however, Auxilio Mutuo scheduled a meeting for December 16, 2009.  Dr. Silva was notified of this meeting through a letter signed by Dr. Aranda, dated December 7, 2009.  Dr. Silva went to the meeting; the presence of

attorneys or recording devices was not allowed at the meeting.
During the meeting, Dr. Silva denied Auxilio Mutuo's allegations
against him and stated that he had performed the sterilization
procedure after obtaining his patient's consent.  The Committee
granted Dr. Silva the opportunity to produce any evidence that
would serve to establish his patient's alleged consent.  Dr. Silva
could not produce the evidence the Committee needed, however,
because doing so would have constituted a violation of the Health
Insurance Portability and Accountability Act ("HIPPA").  His
patient had not authorized the disclosure of her file.  Id. ¶¶ 4,
19, 20-21.

On January 26, 2010, the Committee informed Dr. Silva that it
had decided to maintain his temporary suspension until the hearing
process had been completed and a final adjudication of his case had
been made.  The hospital then proceeded to notify Dr. Silva's
suspension to the National Practitioner Data Bank ("NPDB").  The
NPDB notification indicates that Dr. Silva violated Auxilio Mutuo's
Bylaws.  Dr. Silva contends that this information is false because
even if Auxilio Mutuo can establish that he performed the
sterilization in violation of the established procedures, which
Dr. Silva denies, that procedure is not included in Auxilio Mutuo's
Bylaws.  Dr. Silva further alleges that Auxilio Mutuo's NPDB

notification was *ultra vires*, because it was done without following
the established reporting procedures and because it was directed to
cause him intentional damage.  Id. ¶¶ 24-26.

On February 16, 2010, Dr. Silva formally requested an
evidentiary hearing.  He also again requested the production of
documents necessary for his defense at that hearing.  On March 19,
2010, however, Dr. Armando Nazario ("Dr. Nazario"), President of
the Committee, denied Dr. Silva's request.  The Committee based its
denial on Dr. Silva's failure to establish his position regarding
the allegations against him in his request for a hearing.  The
Committee concluded that Dr. Silva's omission was a waiver of his
right to a hearing.  The Committee also sustained its adverse
decision regarding the suspension of Dr. Silva's privileges.  On
May 26, 2010, Dr. Silva then requested a hearing before the
hospital's Board of Directors ("Board"), the entity which would
issue a final decision in his case.  On August 5, 2010, however,
Dr. Silva was informed that the Board had recommended that his
medical privileges be permanently revoked and that the Board's
Appeal Review Committee had endorsed that recommendation.  Id. ¶¶
27-30.

Dr. Silva professes the "Mita" religion, of which Auxilio
Mutuo is aware.  The Mita religion doctrine differs from the

doctrine of the Catholic Church on the issue of sterilization. Dr. Silva claims that Auxilio Mutuo discriminated against him because of his religious beliefs and that it was for this reason that Auxilio Mutuo took the adverse decision of suspending his medical privileges.  He claims disparate treatment because even though other practitioners with medical privileges at the Auxilio Mutuo carry out sterilization procedures there, they have not been disciplined and no adverse decision has been taken against them. He particularly alleges that Auxilio Mutuo has not taken any adverse decision against Dr. Adrian Colon-Laracuente ("Dr. Colon"), even though he has carried out sterilization procedures without complying with the requirements that Auxilio Mutuo now demands from Dr. Silva.  Moreover, Dr. Silva alleges that the reason Auxilio Mutuo permitted Dr. Colon's actions without imposing adverse consequences is that Dr. Colon kneeled before Dr. Isado and asked for his forgiveness, in a manner similar to the Catholic Church's confession process.  Dr. Silva avers that he cannot do as Dr. Colon did because his Mita religion prevents him from kneeling before another man to ask for forgiveness, either in a personal confession or to show remorse.  Id. ¶¶ 11, 13, 22-23.

## II.  PROCEDURAL BACKGROUND

On March 4, 2011, Dr. Silva filed suit against:  (1) Hospital Español Auxilio Mutuo, Inc., the entity that operates the hospital; (2) Dr. Isado; and (3) the conjugal partnership constituted by Dr. Isado and his wife Mrs. Diana Vigil-Vigil ("Ms. Vigil"), in the Puerto Rico Court of First Instance, San Juan Superior Division, under case number KPE 2011-0846 (904).  (Docket No. 12-1.)  Dr. Silva alleged that the suspension of his privileges was based on illegal discrimination because of religious beliefs, contrary to Article II of the Puerto Rico Constitution ("P.R. Constitution"), id. ¶¶ 5, 44-47, and that Auxilio Mutuo's Bylaws are unjust, unreasonable, null, illegal, and contrary to the Health Care Quality Improvement Act of 1986, 42 U.S.C. §§ 11101-11152 ("HCQIA").  Id. ¶¶ 5, 34, 40, 42.  Dr. Silva requested the following remedies:  (1) a declaratory judgment, stating that his rights had been violated due to discrimination because of his religious beliefs, Id. ¶ 50; (2) a permanent injunction, requiring Auxilio Mutuo to withdraw the adverse notification made to the NPDB, id. ¶ 51; and (3) damages.  Id. ¶ 54.

On March 23, 2011, a day before a preliminary injunction hearing was to be held at the Puerto Rico Court of First Instance, defendants removed the case to this Court.  (Docket No. 1.)  The

notice of removal stayed the injunction hearing. (Docket No. 7
¶ 10.) In support of the removal, defendants alleged: (1) that
the Court has original federal question jurisdiction under
28 U.S.C. § 1441(a) because Dr. Silva anchors his claims on alleged
actions and omissions that are contrary to the HCQIA, a federal
statute; and (2) that the Court has supplemental jurisdiction under
28 U.S.C. § 1367 over Dr. Silva's claims that are based on Puerto
Rico law because they are intimately related to the HCQIA federal
claim and arise from a common nucleus of operative facts. (Docket
No. 1 ¶¶ 7-8.)

On March 24, 2011, Dr. Silva filed a motion for remand.
(Docket No. 7.) Dr. Silva's motion for remand argues: (1) that
the Court must remand the case back to the Puerto Rico Court of
First Instance because of lack of subject-matter jurisdiction;
(2) that sanctions must be imposed on all defendants because their
notice of removal stayed an injunction hearing that had been
scheduled in the Puerto Rico Court and the stay has caused
unnecessary delay of the case; and (3) that if the case is not
remanded, the Court should enter a temporary restraining order
against defendants, directed at preserving the *status quo* until
further action is taken. (Docket No. 7 ¶¶ 3, 9, 12.)

On March 25, 2011, the Court issued an order instructing defendants to show cause as to why this case should not be remanded to the Court of First Instance of Puerto Rico, San Juan Division, in view of the Opinion and Order issued in Garib v. Hospital Español Auxilio Mutuo, Civil No. 10-1290 (FAB) (D.P.R. March 25, 2011) (Docket No. 10.)  Defendants complied with this Order; on April 4, 2011, they filed a motion in opposition to Dr. Silva's motion to remand.  (Docket No. 11.)  Defendants allege that the Court has jurisdiction to entertain Dr. Silva's claim because interpretation of a federal statue is necessary to establish various elements of Dr. Silva's causes of action.  Id. at 3.

## III. STANDARD OF REVIEW

Federal courts are courts of limited jurisdiction.  See, e.g., Bonas v. Town of N. Smithfield, 265 F.3d 69, 73 (1st Cir. 2001). A cause of action may be maintained in federal court "only if it involves a question of federal law, or if the controversy is between citizens of different states and the amount in controversy exceeds $75,000."  28 U.S.C. §§ 1331, 1332; Hall v. Curran, 599 F.3d 70, 71 (1st Cir. 2010).  A case may only be removed from state court if a federal court would have had subject-matter jurisdiction over the case if brought in federal court initially.  See Danca v. Private Health Care Sys. Inc., 185 F.3d 1, 4 (1st Cir. 1999).

Courts should "strictly construe[]", the removal statute; consequently, uncertainties must be resolved in favor of remand. See Rossello Gonzalez v. Calderon Serra, 398 F.3d 1, 11 (1st Cir. 2004) (citing Shamrock Oil & Gas Corp. v. Sheets, 313 U.S. 100, 108-109 (1941)). The presumption is that a cause lies outside of the court's limited jurisdiction, and that "the party invoking the jurisdiction of a federal court carries the burden of proving its existence." Murphy v. United States, 45 F.3d 520, 522 (1st Cir. 1995).

## IV.  DISCUSSION

Dr. Silva has moved to remand on the ground that there is no subject-matter jurisdiction, while defendants claim federal question jurisdiction as the basis for removal. Defendants must therefore make "a 'colorable' showing that a basis for federal jurisdiction exists." See Danca, 185 F.3d at 4 (citing BIW Deceived v. Local S6, Indus. Union of Marine and Shipbuilding Workers of Am., IAMAW Dist. Lodge 4, 132 F.3d 824, 832 (1st Cir. (1997)).

Federal question jurisdiction exists if the action arises "under the Constitution, laws, or treaties of the United States". 28 U.S.C. § 1331. To determine this jurisdictional pre-requisite, the well-pleaded complaint rule must be followed. Merrell Dow

Pharm. Inc. v. Thompson, 478 U.S. 804, 808 (1986).  The Court examines "the 'well pleaded' allegations of the complaint and ignore[s] potential defenses." Beneficial Nat'l. Bank v. Anderson, 539 U.S. 1, 6 (2003).  A federally created right or immunity must appear "on the face of the complaint", see Brough v. United Steelworkers of Am., AFL-CIO, 437 F.2d 748, 749 (1st Cir. 1971), and the federally created right or immunity must be an essential element of plaintiff's cause of action.  Franchise Tax Bd. v. Constr. Laborers Vacation Trust, 463 U.S. 1, 10-11 (1983).

     A case may also arise under federal law when the determination of a state-law claim is dependent upon an interpretation of a federal law. Merrell Dow, 478 U.S. at 808.  If this is the case, however, an interpretation of a "substantial, disputed question of federal law" is necessary for the determination of one of plaintiff's well-pleaded state claims. Franchise Tax Bd., 463 U.S. at 13.  The "substantial federal question" doctrine has three components:  (1) the state-law claim must "necessarily raise a stated federal issue"; (2) the federal issue must be "actually disputed and substantial"; and (3) the exercise of jurisdiction must not disturb the "congressionally approved balance of federal and state judicial responsibilities."  See Cambridge Literary Props., Ltd. v. W. Goebel Porzellanfabrik G.m.b.H. & CO. KG, 510

F.3d 77, 96 (1st Cir. 2007) (citing <u>Grable & Sons Metal Prods.,</u>
<u>Inc. v. Darue Eng'g. & Mfg.</u>, 545 U.S. 308, 314 (2005)).

Defendants concede that Dr. Silva's complaint does not arise
under federal law, because the HCQIA does not provide for a private
federal cause of action. (Docket No. 11 at 10.) Defendants argue,
however, that the Court has subject-matter jurisdiction over this
case because Dr. Silva's well-pleaded complaint raises a federal
question. They argue that Dr. Silva's theory of liability rests on
the premise that the defendants violated the HCQIA and that such a
violation is the legal cause of his damages. (Docket No. 11 at 12
¶ 1.) Defendants also argue that the Court has subject-matter
jurisdiction under the "substantial federal question" doctrine,
because an interpretation of the HCQIA is needed to establish an
element of Dr. Silva's causes of action. <u>Id</u>. Defendants'
arguments are not convincing.

The HCQIA is a federal statute enacted in 1986 in response to the crisis in the monitoring of health care professionals.[3]  The HCQIA was passed by Congress to "provide incentive and protection for physicians engaging in effective professional peer review." 42 U.S.C. § 11101(5).  It was Congress's intention that doctors involved in the peer review process would comply with the reporting requirements established in the HCQIA and thereby decrease the number of occurrences of medical malpractice.  Addis v. Holy Cross Health Sys. Corp., 88 F.3d 482, 485 (7th Cir. 1996).  Congress understood that the HCQIA would "improve the quality of medical care by encouraging physicians to identify and discipline other physicians who are incompetent or engage in unprofessional behavior." Wayne v. Genesis Med. Ctr., 140 F.3d 1145, 1148 (8th

---

[3]Although state licensing boards had long monitored the conduct and competence of their own health care workers, Congress found that "[t]he increasing occurrence of medical malpractice and the need to improve the quality of medical care have become nationwide problems that warrant greater efforts than those that can be undertaken by any individual State." 42 U.S.C. § 11101(1).  Finding that incompetent "physicians find it all to[o] easy to move to different hospitals or states and continue their practices in these new locations," Congress mandated the creation of a national database that recorded incidents of malpractice and that was available for all health care entities to review when screening potential employees." Singh v. Blue Cross/Blue Shield of Mass., Inc., 308 F.3d 25, 31 (1st Cir. 2002) (citing H.R.Rep. No. 99-903, at 2, reprinted in 1986 U.S.C.C.A.N. 6384, 6385).

Cir. 1998) (citing H.R.Rep. No. 99-903, at 2 (1986), as reprinted in 1986 U.S.C.C.A.N. 6287, 6384.)

Because the HCQIA was enacted for the purpose of protecting patients, not physicians, see,e.g., Hancock v. Blue Cross-Blue Shield of Kan., Inc., 21 F.3d 373, 374-75 (10th Cir. 1994), it is well-settled that the HCQIA does not create an explicit or implicit private cause of action for physicians that are subject to a professional peer review.  See,e.g., Singh v. Blue Cross/Blue Shield of Mass., Inc., 308 F.3d 25, 45 (1st Cir. 2002).  What the HCQIA does create, however, is a presumptive statutory immunity from damages liability for those performing the professional peer review.  42 U.S.C. §§ 11111-11112.  Thus, if those performing the review fail to follow HCQIA standards, the entity and the persons participating in the peer review will not be immune.[4]  See Singh 308 F.3d at 31, 44. In other words, if defendants followed the standards established in the HCQIA when they decided to suspend Dr.

---

[4] To benefit from this immunity, "a professional review action must be taken:  (1) in the reasonable belief that the action was in furtherance of quality health care, (2) after a reasonable effort to obtain the facts of the matter, (3) after adequate notice and hearing procedures are afforded to the physician involved or after such other procedures as are fair to the physician under the circumstances, and (4) in the reasonable belief that the action was warranted by the facts known after such reasonable effort to obtain facts and after meeting the requirements of paragraph (3)."  42 U.S.C. § 11112(a); Tirado Menendez v. Hospital Interamericano de Medicina Avanzada, 476 F.Supp.2d 79, 82 (D.P.R. 2007).

Silva's privileges, they will be immune from damages. On the contrary, if they did not follow the standards established in the HCQIA, they will not be immune. 42 U.S.C. §§ 11111-11112; See Singh, 308 F.3d at 44.

Pursuant to article 1802 of the Civil Code, in order to recover for damages a plaintiff has to establish: (1) that a harm was actually done; (2) that there is a causal nexus between the harm and the act or omission of another person; and (3) that the act or omission arises out of fault or negligence. P.R. Laws Ann. tit. 31, § 5141; See Arroyo Lopez v. E.L.A., ___ P.R. Offic. Trans. ___ (P.R. 1990) (1990 WL 658765). Furthermore, when a plaintiff is claiming liability based on an omission, the determination must be whether there exists a "legal duty to act on part of the tortfeasor . . . the nonperformance of which constitutes the illegal nature . . . and the fact that the injury could have been avoided if the omitted act had been carried out.". Sociedad de Gananciales v. Gonzalez Padin, 17 P.R. Offic. Trans. 111 (P.R. 1986). The negligent act then, will be defined as a "breach of the duty imposed or recognized by law" to act. Pacheco Pietri v. E.L.A., 1993 P.R.-Eng. 839. 817 (P.R. 1993).

In his complaint, Dr. Silva requested the following remedies: (1) a declaratory judgment, stating that Dr. Silva's rights had

been violated due to discrimination because of his religious
beliefs (Docket No. 12-1 ¶ 50); (2) a permanent injunction,
requiring Auxilio Mutuo to withdraw the adverse notification made
to the NPDB, id. ¶ 51; and (3) damages. Id. ¶ 54. Defendants
argue that merely because Dr. Silva claims HCQIA violations, the
well-pleaded complaint automatically raises a federal question that
gives the Court subject-matter jurisdiction. Their conclusion "is
plainly wrong". Daigle v. Stulc, 694 F.Supp.2d 30, 35 (D.Me 2010).

     Dr. Silva claims that Auxilio Mutuo failed to act in a certain
way, and that the omission caused him damages. In order for
defendants' argument to be valid, the HCQIA would have to provide
for a legal duty to act, or would have to provide for some element
of Dr. Silva's causes of action. It does not. While the HCQIA
encourages health care facilities and providers to engage in
professional peer review, it does not require it. Rather, the
statute simply grants immunity to those who choose to engage in
such procedures and does not "provide a clear mandate to act or not
to act in a particular way." See Ryskin v. Banner Health Inc.,
No. 09- 1864, 2010 WL 4818062, at *10 (D.Colo. November 9, 2010);
Boyer v. Lehigh Valley Hosp. Ctr., Inc., No. 89-7315, 1990 WL
94038, at *2 (E.D.Pa. July 2, 1990) (the HCQIA peer review
protection provisions merely conditionally immunize peer review

groups and do not impose mandatory regulations over the conduct of private entities.)  While Dr. Silva's complaint mentions the HCQIA, it does not purport to base his claims on the HCQIA.  Neither does it appear that he would need to rely on the HCQIA to prove his claims.  Because there is no duty in the HCQIA for Auxilio Mutuo to breach, its alleged non-compliance with the statute cannot be the legal cause of Dr. Silva's damages.  The only thing that non-compliance with the HCQIA could cause, if anything, would be the loss of Auxilio Mutuo's and the members of the different boards' and committees' immunity.  Thus, whether Auxilio Mutuo breached the procedures established in the HCQIA is not critical to Dr. Silva's causes of action.

Defendants' next attempt to argue that the Court has subject-matter jurisdiction under the "substantial federal question" doctrine.  They claim that this case meets the three-prong test established in Grable, 545 U.S. at 318.  The Court disagrees. While Grable permits the exercise of federal jurisdiction even when a case lacks a federal cause of action, it does so only when a "state-law claim necessarily raise[s] a stated federal issue, actually disputed and substantial, which a federal forum may entertain without disturbing any congressionally approved balance of federal and state judicial responsibilities".  Id. at 314.  In

this case, however, there exists no issue so substantial as to fit

within the narrow set of circumstances Grable recognized.  "There

is no federal agency involved; the federal question is raised

mainly as an anticipated defense, . . . and, the resolution of the

question is unlikely to serve as new and binding precedent.

Westmoreland v. Pleasant Valley Hosp., Inc., No. 08-1444, 2009 WL

1659835, at *4 (S.D.W.Va. June 12, 2009).

Defendants also argue that the Court has subject-matter

jurisdiction because Dr. Silva has the burden to rebut the HCQIA

immunity presumption before he can establish the elements of his

claims, and that for this, HCQIA interpretation is needed to

establish his claim.  Defendants' argument is flawed.  It has been

held that under HCQIA, the plaintiff does not need to allege in his

complaint the lack of immunity in order to state a claim upon which

relief can be granted.  Wahi v. Charleston Area Med. Ctr., No. 04-

0019, 2004 WL 2418316, * 6 (S.D.W.Va. October 27, 2004).  Because

the HCQIA confers immunity only from "liab[ility] in damages," 42

U.S.C. § 11111(a)(1), it does not foreclose an award of equitable

relief, Ritten v. Lapeer Reg'l. Med. Ctr., No. 07-10265, 2010 WL

374163, at * 2 (E.D.Mich. January 25, 2010), and does not provide

a "right to avoid standing trial.".  See Bryan v. James E. Holmes

Reg'l. Med. Ctr., 33 F.3d 1318, 1322 (11th Cir. 1994); Decker v.

IHC Hosp., Inc., 982 F.2d 433, 434-35 (10th Cir. 1992); Singh, 308
F.3d at 44.   Furthermore, it has already been held that with the
HCQIA, "Congress simply created a new defense for peer review
bodies who followed its reporting procedures."   Schmidt v.
Principal Health Care of Louisiana, Inc., No. 96-1260, 1996 WL
264990, *4 (E.D.La. May 16, 1996).   The HCQIA, therefore, will only
play a role when determining whether or not Auxilio Mutuo is immune
from the damages Dr. Silva claims.   See, e.g., Parsons v. Sanchez,
46 F.3d 1143, 1995 WL 21695 (Table) (9th Cir. 1995); Knatt v. Hosp.
Serv. Dist. No. 1 of East Baton Rough Parish, 373 Fed.Appx. 438,
444 (5th Cir. 2010); Singh, 308 F.3d at 35.   The question posed by
the HCQIA will not be whether the Auxilio Mutuo is liable under the
HCQIA, but whether the HCQIA will or will not immunize it from
money damages, based upon other legal theories.   See MacArthur v.
San Juan County, 416 F.Supp.2d 1098, 1139 (D.Utah 2005).

**V.   CONCLUSION**

     For the foregoing reasons, the Court **GRANTS** plaintiff's motion
for remand.   (Docket No. 7.)   Plaintiff's complaint is **REMANDED** to
the Puerto Rico's Court of First Instance, San Juan Superior
Division, Case No. KPE 2011-0846 (904).   Judgment shall be entered
accordingly.

Defendant's request for sanctions and temporary restraining order is **DENIED.**

**IT IS SO ORDERED.**

San Juan, Puerto Rico, May 3, 2011.

<u>s/ Francisco A. Besosa</u>
FRANCISCO A. BESOSA
UNITED STATES DISTRICT JUDGE